Edwards v New York City Health & Hosps. Corp. (2026 NY Slip Op 50175(U))

[*1]

Edwards v New York City Health & Hosps. Corp.

2026 NY Slip Op 50175(U)

Decided on February 17, 2026

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 17, 2026
Supreme Court, Kings County

Jennifer Edwards, Plaintiff,

againstNew York City Health & Hospitals Corporation, 
 KINGS COUNTY HOSPITAL and HENRY TALUS, Defendants.

Index No. 531712/2023

PlaintiffCharles John Mirisola ([email protected])The Oshman Mirisola Law Group, PLLC80 8th Avenue Suite 901New York, NY 10011212-601-9300DefendantsOlena Sharvan ([email protected])Vaslas Lepowsky Hauss & Danke LLP201 Edward Curry Avenue Suite 100Staten Island, NY 10314718-761-9300

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: 85 — 136, 137 — 145, 146Defendants Henry Talus, M.D. ("Dr. Talus") and New York City Health and Hospitals Corporation ("NYCHHC"), sued herein as New York City Health & Hospitals Corporation and Kings County Hospital, move for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing all Plaintiff's claims against them (Seq. No. 2). Plaintiff opposes the motion.
Plaintiff commenced this action on October 31, 2023, asserting claims of medical [*2]malpractice and lack of informed consent against NYCHHC and Dr. Talus. The claims arise from a total meso-rectal excision surgery performed by Dr. Talus on May 17, 2022. Three months after the procedure, a vaginoscopy revealed staples had been placed in the anterior and posterior vaginal wall, requiring corrective surgeries.
Plaintiff was 63 years old at the time of the events at issue. In November 2021, she was diagnosed with stage III rectal cancer. She underwent chemotherapy and radiation treatment for six weeks, after which she was scheduled for a total meso-rectal excision surgery to remove the cancer.
On May 17, 2022, the total meso-rectal excision surgery was performed at Kings County Hospital, a NYCHHC facility, by the attending colorectal surgeon Dr. Talus. The procedure included lower anterior resection, colorectal anastomosis, ostomy creation, and flexible sigmoidoscopy. She was transferred to the surgical ICU for post-operative care and discharged on May 29.
Plaintiff saw Dr. Talus for a follow-up examination on June 2, 2022. She reported frequent urination and burning. She later presented to the Kings County Hospital emergency department on June 7 and was diagnosed with urinary retention and acute cystitis.
On August 4, 2022, Plaintiff underwent a digital vaginal examination at Kings County Hospital, which revealed a line of staples approximately 2 cm from the hymen, blocking the upper vagina. This finding was confirmed by a cystoscopy and vaginoscopy on August 12. A vaginogram at NYU Langone on September 20 revealed a fistula connecting the posterior vagina to the colorectal anastomosis.
Plaintiff underwent a vaginoscopy at NYU Langone on September 22, 2022, which documented the staples through the anterior and posterior wall, "obliteration" of the vagina, and incorporation of the vagina into the colorectal anastomosis between the colon and rectum. She later underwent an exploratory laparotomy at NYU on March 29, 2023, during which the anastomosis was taken apart and redone, and the vaginal defect was closed.
Plaintiff alleges that Dr. Talus departed from the standard of care in his performance of the May 17, 2022 surgery, which proximately caused Plaintiff's vaginal stapling and related injuries, including urinary dysfunction, pain during intercourse, and need for additional surgery. Plaintiff's claims against NYCHHC arise from their vicarious liability for Dr. Talus, an employee of Kings County Hospital.
In evaluating a summary judgment motion in a medical malpractice action, the court considers the "essential elements" of medical malpractice: "(1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury" (Miller-Albert v EmblemHealth, 231 AD3d 1147, 1148 [2d Dept 2024] [internal quotation marks and citations omitted].) "Thus, a defendant moving for summary judgment must make a prima facie showing either that there was no departure from accepted medical practice, or that any departure was not a proximate cause of the patient's injuries. To meet that burden, a defendant must submit in admissible form factual proof, generally consisting of affidavits, deposition testimony and medical records, to rebut the claim of malpractice." (I.d.) "If the defendant makes such a showing, the burden shifts to the plaintiff to raise a triable issue of fact as to those elements on which the defendant met its prima facie burden of proof" (Delia v Wieder, 236 AD3d 857, 858 [2d Dept 2025]). "Generally, summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions" (Garcia v Hollander, 241 AD3d 651, 653 [2d Dept 2025] [internal quotation marks and citations omitted].) [*3]However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023]).
In support of their motion, Defendants submit an expert affirmation from Brian Harlin, M.D. ("Dr. Harlin"), a licensed physician board certified in general surgery and colon and rectal surgery.
Dr. Harlin opines that all treatment rendered to Plaintiff by Dr. Talus at Kings County Hospital was within good and accepted medical standards. He states that the May 17, 2022 surgery performed was indicated and medically necessary to treat cancer, and that the performance of the surgery complied with the standard of care. He opines that "proper visualization techniques were employed" using a 3D laparoscope. He further opines, based on the testimony of Dr. Talus, that "standard protective measures during anastomosis creation" were used, including traction and counter-traction and a manual vaginal exam before the stapler was introduced. He further opines that it was appropriate within the standard of care for Dr. Talus to switch to a larger black load stapler in the presence of thickened and inflamed tissue. He states that claims that Dr. Talus improperly performed a "vaginectomy or colpocleisis" are without merit, because no such procedure was intentionally "performed or contemplated" in the operative report.
On proximate causation, Dr. Harlin opines that "staple line incorporation of the vaginal walls and/or rectovaginal fistula are known, recognized, but accepted surgical risks" of this type of procedure, especially when the patient has undergone radiation treatment. He opines that this complication can occur in the absence of malpractice.
Additionally, he opines that Plaintiff's claims of urinary dysfunction were not proximately caused by the vaginal staples, as this "could not affect bladder and urethra function" and she had some history of urinary complaints prior to the surgery. He opines that her pelvic surgery, radiation therapy, and cancer treatment "created multiple potential causes for urinary dysfunction unrelated to any vaginal involvement."
The movants also submit an expert affirmation from Charles J. Ascher-Walsh, M.D. ("Dr. Ascher-Walsh"), a licensed physician board certified in obstetrics and gynecology and female pelvic medicine and reconstructive surgery.
Dr. Ascher-Walsh primarily renders opinions as to proximate causation of Plaintiff's injuries. He opines that the stapling of the vagina and the development of the fistula did not cause or contribute to Plaintiff's urinary dysfunction, as they had no effect on the bladder. Further, he opines that urinary "urge incontinence" and pelvic floor dysfunction are known complications of radiation therapy. Therefore, he opines that it was the necessary cancer radiation treatments which caused her urinary symptoms, rather than any act or omission by Dr. Talus in the May 17, 2022 surgery.
Similarly, he opines that her frequent UTIs were not a result of the stapling or fistula. He opines that symptoms of urge incontinence caused by radiation are often misdiagnosed as UTIs, that it is "not common" for a fistula to cause UTIs, and that it was unlikely fecal matter passed through her vagina due to her loop ileostomy. Finally, he opines that her "inability to engage in penetrative vaginal intercourse" was caused by radiation complications, as radiation cause the vagina to "become rigid and less lubricated."
Based on these submissions, the movants have established prima facie entitlement to summary judgment. The experts have proffered sufficiently detailed opinions as to the standard [*4]of care and proximate causation, and the burden therefore shifts to Plaintiff to raise an issue of fact.
In opposition, Plaintiff submits an expert affirmation from Stephen M. Cohen, M.D. ("Dr. Cohen"), a licensed physician board certified in general surgery and colorectal surgery.
Dr. Cohen opines that Dr. Talus departed from the standard of care by negligently and improperly placing staples in Plaintiff's vaginal walls during the May 17, 2022 surgery. Specifically, he opines that Dr. Talus failed to properly identify, visualize, and maintain the separation of the rectal and vaginal planes.
In this type of surgery, he opines that the specific surgical techniques should be used to provide traction and counter-traction and identify the posterior and anterior vaginal walls. These techniques include "using an end-to-end anastomosis sizer laced within the vagina to improve visualization of the vaginal plane, packing the vagina with sterile packing, and/or placing a hand with the vagina." The expert opines that these surgical techniques "would have provided adequate traction and counter-traction" to maintain the rectal and vaginal planes and prevent the injury sustained by Plaintiff. However, the expert notes that Dr. Talus made no mention of such precautions in his operative report. He opines that based on the stapling which occurred, these methods were either not performed or improperly performed.
The expert explains that during the lower anterior resection portion of the procedure, the surgeon must "reattach the two portions of the rectum by means of a circular surgical stapler" after the lesion is removed. This creates an anastomosis connecting the rectum to the colon. The expert opines that a surgeon is required by the standard of care to identify and separate the vaginal and rectal planes, especially where the patient had a prior hysterectomy and pelvic issue is "thickened and inflamed" due to radiation treatment. He opines that Dr. Talus failed to exercise appropriate vigilance and care when he applied staples to the vaginal walls and incorporated them into the rectal anastomosis.
The expert opines that Dr. Talus departed from the standard of care by switching to a larger black load endoGIA stapler during the surgery "due to the extremely thickened, inflamed, irradiated tissue," according to the operative report. He opines that Dr. Talus should have paused and reevaluated why the smaller stapler would not close, and he "should have known there was too much tissue incorporated" rather than "assuming" it was thickened tissue.
The expert also opines that Dr. Talus departed from the standard of care by failing to recognize the injury intraoperatively. He notes that there was no mention of this complication in the operative report, and he was seemingly "not aware" that it occurred. The expert opines that Dr. Talus failed to perform a digital vaginal exam after the surgery, contrary to his deposition testimony, as doing so would have revealed that the vagina had been stapled closed 2 cm from its opening. He opines that this was an independent departure from the standard of care which delayed diagnosis and treatment of the injury.
On proximate causation, the expert notes that "this was not a case of an isolated or errant staple," but a full line of "multiple permanent staples, approximately ten" which mechanically sealed Plaintiff's vaginal canal 2 cm from the opening. He opines that this constitutes an "extensive incorporation of the vagina into the staple line rather than a limited or incidental injury," and this would not have occurred in proper surgical technique and preventative measures were employed.
Dr. Cohen states that during his 30 years of experience as a surgeon, he has never heard of a surgeon stapling both walls of the vagina together during a lower anterior resection. He [*5]further opines that when the rectal and vaginal planes are "properly identified and preserved, incorporation of vaginal tissue into the anastomosis is anatomically impossible." He opines that this is "never an accepted risk of this surgery when proper surgical technique is used."
Plaintiff also submits an expert affirmation from a licensed physician [name of expert redacted], board certified in obstetrics and gynecology, urogynecology and reconstructive pelvic surgery. Plaintiff has presented a signed, unredacted copy of the affirmation to the Court for in camera inspection.
The ob/gyn and urogynecology expert opines that Dr. Talus departed from the standard of care by negligently placing staples in Plaintiff's vaginal walls, an occurrence which they opine could not take place without malpractice. They opine that the endoGIA stapler used during the surgery was incorrectly used to "seal the rectum and vagina together" rather than create a staple line for the anastomosis alone.
The expert notes that Dr. Talus testified that he performed a digital vaginal exam, but there is no record of this exam being performed in the operative report. The expert opines that Dr. Talus failed to properly perform a digital vaginal exam, as this would have revealed the line of staples and shortened vaginal length of 2 cm. They note that Plaintiff's subsequent physicians found it impossible to insert fingers or speculum, and therefore Dr. Talus "could not have performed the vaginal exam described in his testimony."
Contrary to the movants' expert who stated a vaginectomy (removal of the vagina) or colpotomy (vaginal incision) were not part of the procedure, Plaintiff's expert opines that the incorporation of the vagina and reduction to 2 cm effectively constituted an improper performance of such surgeries. The expert notes that in a colpotomy procedure on the vagina, the standard of care is to use a suture that absorbs over time, and the use of permanent staples is contraindicated and never practiced in gynecologic surgery. From the perspective of a urogynecologist, the expert states they have "never seen nor heard" of staples being placed in both walls of the vagina "sealing the vagina at 3/4 of an inch from the hymen."
The expert states that the average vaginal length following a hysterectomy (which Plaintiff had prior to the procedure) is 7-9 cm, and the average length following lower anterior resection and radiation is 6 cm. Her vaginal length in August 2022 had been shortened to 2 cm, which "effectively removed two-thirds of her vagina," a procedure which was not indicated and improperly performed.
The expert notes that although the movants now concede that the staples were placed during surgery, Dr. Talus's deposition was replete with denials that the stapling did not occur. Addressing the testimony of Dr. Talus, the expert opines that based on the medical record, there is "nothing to indicate there were staples in the vaginal walls" prior to the May 17, 2022 surgery, as they would have been clearly visible on pre-operative CT scans and MRIs. The expert further opines that the "row of staples" found in August-September is directly linked to the endoGIA stapler used in the colorectal surgery.
On proximate causation, the expert opines that Plaintiff's "persistent complaints" including urinary dysfunction, urinary tract infections, suprapubic/lower abdominal pain, and fecal matter in the vagina were a direct result of the improperly placed staple line. The expert further opines that these injuries necessitated further treatment, including "major reconstructive surgery" in March 2023 to address the rectovaginal fistula. Additionally, the expert opines that the departure proximately caused permanent injuries to the function of her vagina, and although a surgical repair was performed on the fistula, "the necessity for additional pelvic surgery [*6]worsens the severity and duration of pain and urinary dysfunction which may not resolve."
Finally, Plaintiff submits an expert affirmation from a licensed physician [name of expert redacted], board certified in gynecologic oncology and obstetrics and gynecology. Plaintiff has presented a signed, unredacted copy of the affirmation to the Court for in camera inspection.
Plaintiff's gynecologic oncology expert echoes the opinion of the other experts that the anterior and posterior walls of the vagina were negligently stapled together during the resection and anastomosis performed by Dr. Talus.
The expert opines that proper surgical technique requires "specifically identifying, developing, visualizing and maintaining the rectovaginal plane so that the vagina is kept out of the staplers used to the divide and remove the rectum and connect the rectum with the colon in an anastomosis." The expert opines that Dr. Talus departed from the standard of care by failing to take precautions, including identifying the rectovaginal plane and isolating the rectum from surrounding organs The expert opines that he did not exercise proper "surgical vigilance," particularly because the patient had undergone radiation treatment which thickened and inflamed her pelvic tissue. The expert also opines that Dr. Talus improperly used the endoGIA stapler, which is not meant to seal tissue beyond 2.5-3 mm. The expert notes that permanent staples of this kind are never used to "remove, close, repair or suspend the vagina," and even in a vaginectomy the standard of care would require "separate incision of the vaginal walls individually."
The expert opines that the injury sustained by Plaintiff could only occur as a result of malpractice and improper surgical technique. The expert further opines that in their extensive experience and background of 19 years, they have "never seen nor heard of a surgeon stapling both walls of the vagina together," countering the opinion of the movant's experts that this is a known and accepted risk of the procedure.
On the issue of proximate causation, the expert opines in detail that the alleged departures of Dr. Talus in placing the staples caused Plaintiff's claimed injuries, including the formation of a rectovaginal fistula requiring surgical repair, pain in the lower abdomen, urinary dysfunction, and pain during sexual intercourse. The expert also opines that the departures caused a delay in Plaintiff's ability to heal and remove her ileostomy bag, impacting her quality of life.
The expert also counters the movants' expert affirmations that Plaintiff's claimed injuries were the result of radiation and not the intraoperative injury. Plaintiff's expert opines that vaginal stenosis from radiation is a complication that would manifest more than a year after treatment, not within 3-4 months as it did in Plaintiff's case.
Plaintiff's expert further counters the opinion that her urinary symptoms were not causally related to the vaginal staples. The expert opines that innervation of the bladder was disrupted by the vaginal wall injury. Further, the expert opines that painful stimulus from metal staples or tacks in the vagina are known to cause pain and urinary urgency, "even when the bladder is not directly involved," and her shortened vagina resulted in disruption of the structural support to parts of the bladder. Thus, the expert opines that the vaginal staples caused or worsened her urinary urgency and dysfunction.
Similarly, the expert counters the movant's expert opinion that pain during intercourse is a known and accepted result of radiation treatment. The expert opines that the effects of radiation on vaginal tissue and length would not manifest until "several months to years following treatment," whereas her symptoms were noticed immediately. The expert also opines [*7]that as a result of the staples placed only 2 cm within her vagina, penetrative sex was not only unpleasant but "impossible."
Based on these submissions, Plaintiff's experts have raised clear issues of fact as to Dr. Talus' alleged departures from the standard of care, including failing to properly employ certain surgical techniques, negligently causing the stapling injury, and failing to timely recognize the injury.
Plaintiff's experts have also countered the movant's opinions on proximate causation, including with respect to her urinary dysfunction and other claims. "When experts offer conflicting opinions, a credibility question is presented requiring a jury's resolution" (Stewart v. North Shore University Hospital at Syosset, 204 AD3d 858, 860 [2d Dept 2022], citing Russell v. Garafalo, 189 AD3d 1100, 1102, [2d Dept. 2020]). As the experts have proffered conflicting opinions as to the standard of care and proximate causation, the motion for summary judgment on the medical malpractice claims must be denied.
On the issue of informed consent, this is a separate cause of action for which the plaintiff must ultimately prove:
"(1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury. The third element is construed to mean that the actual procedure performed for which there was no informed consent must have been a proximate cause of the injury" (Figueroa-Burgos v Bieniewicz, 135 AD3d 810, 811-812 [2d Dept 2016] [internal citations and quotation marks omitted]).
The Second Department has held that "while the signing of a generic consent form by the plaintiff does not establish that a defendant is entitled to summary judgment, a defendant can establish entitlement to summary judgment by demonstrating that the plaintiff signed a detailed consent form after being apprised of alternatives and foreseeable risks" (Pirri-Logan v Pearl, 192 AD3d 1149 [2d Dept 2021] [internal citations omitted]).
The movants' experts opine that Plaintiff was informed of the reasonably foreseeable risks of the procedure before signing a consent form, including "injury to surrounding structures" or "injury to surrounding organs, tissues, and nerves." As Plaintiff notes in opposition, the consent form includes "damage to surrounding structures (vessels, nerves, ureters)" and contains no mention of vaginal injury as a known risk. The Court finds that issues of fact remain as to whether the injuries sustained by Plaintiff were known and foreseeable risks of the procedure, and if so, whether they were properly disclosed to Plaintiff before she consented to the procedure.
The movants do not address the second element of informed consent (reasonably prudent person), and issues of fact remain as to the third element of proximate causation. Accordingly, summary judgment cannot be granted on the informed consent claim as a matter of law.
Lastly, Plaintiff does not oppose the part of the motion seeking to dismiss any direct claims against NYCHHC for negligent hiring, credentialing, and supervision. That part of the motion is granted without opposition.
It is hereby:
ORDERED that Defendants' summary judgment motion (Seq. No. 2) is GRANTED TO THE EXTENT of dismissing any direct claims against NYCHHC for negligent hiring, credentialing, and supervision, and the motion is otherwise DENIED.
This constitutes the decision and order of this Court.
ENTER.Hon. Consuelo Mallafre MelendezJ.S.C.